NORTHERN STATES POWER COMPANY (WIS.), Appellant, vs. TAX COMMISSION and others, Respondents.

ST. CROIX FALLS WISCONSIN IMPROVEMENT COMPANY (WIS.), Appellant, vs. SAME, Respondents.

INTERSTATE LIGHT & POWER COMPANY (WIS.), Appellant, vs. SAME, Respondents.

CHIPPEWA POWER COMPANY (WIS.), Appellant, vs. SAME, Respondents.

MIDLAND PUBLIC SERVICE COMPANY (WIS.), Appellant, vs. SAME, Respondents.

*February 7—April 15, 1941.*

For the appellants there were briefs by *G. A. Youngquist* of Minneapolis, Minnesota, and *John M. Campbell* of Eau Claire, attorneys, and *Fowler, Youngquist, Furber, Taney & Johnson* of Minneapolis, Minnesota, and *Beach, Campbell & Holland* of Eau Claire of counsel, and oral argument by *Mr. Youngquist* and *Mr. Campbell*.

For the respondents there were briefs by the *Attorney General* and *Harold H. Persons,* assistant attorney general, attorneys, and *Myron L. Silver* and *Clarence E. Smith* of the staff of counsel, and oral argument by *Mr. Persons, Mr. Silver,* and *Mr. Smith*.

ROSENBERRY, C. J. The questions raised in these cases involve the taxable income of the several subsidiaries of the Northern States Power Company (Del.). The intercorporate relationship of these subsidiaries is shown in the accompanying chart:

All of the above companies were in practical effect managed by the same persons as officers and directors. As of

December 31, 1929, John J. O'Brien was president, J. J. Molyneaux was treasurer, and M. A. Morrison was secretary of each of the above companies except Eau Claire Dells Improvement Company, which at that time was not a part of the subsidiary system. The numerous vice-presidents' and directors' positions in each company were held with only minor exceptions, by persons who held one or more of such offices in at least one other, and in many cases, all of the affiliated companies. The business relations and the extent of the intercompany contracts are shown by the following resume:

"Interstate Light & Power Co. (Wis.) (Platteville Division) purchased 99% of its electric energy needs from Interstate Light & Power Co. (Del.)

"Interstate Light & Power Co. (Wis.) (Hudson Division) purchased 100% of the gas which it sold from Northern States Power Co. (Minn.)

"Interstate Light & Power Co. (Prescott.Division) purchased 100% of its electric energy needs from Northern States Power Co. (Minn.)

"Interstate Light & Power Co. (Wis.) (Apple River Division) hydroelectric energy was disposed of by Northern States Power Co. (Minn.)

"St. Croix Power Co. sold over 99% of the electric energy which it generated to Northern States Power Co. (Minn.)

"St. Croix Lumbermen's Dam and Boom Co. owned a water storage dam in conjunction with St. Croix River Navigation & Improvement Co. (Minn.). The use of this storage water was made available to St. Croix Falls Wisconsin Improvement Co.

"St. Croix Falls Wisconsin Improvement ·Co. owned a dam and hydroelectric development in conjunction with the St. Croix Falls Minnesota Improvement Co. The entire output, less a small amount for local users, was sold to the St. Croix Falls Minnesota Improvement Co., which company sold the energy to the Minneapolis General Electric Co.

"Midland Public Service Co. purchased 100% of its electric needs from Northern States Power Co. (Wis.)

"Chippewa Power Co. leased its dam and hydroelectric plant to Northern States Power Co. (Wis.)

"Eau Claire Dells Improvement Co. sold its entire output of electric energy to Northern States Power Co. (Wis.)

"Northern States Power Co. (Wis.) sold to Northern States Power Co. (Minn.) from 52% to 75% of its purchased and generated kilowatt-hours of electric energy."

The method of financing the various subsidiaries was also drawn in question. Generally speaking, the subsidiaries were financed either directly or indirectly by Northern States Power Company (Del.) by loans upon which six per cent interest compounded monthly was exacted. The result of this method of financing was that in 1931 the capital stock of the Wisconsin companies consisted of approximately nineteen per cent capital stock and eighty-one per cent interest-bearing indebtedness while the capital stock of the Northern States Power Company (Del.) and all of its subsidiaries, including the Wisconsin companies, consisted of approximately fifty-one per cent capital stock and forty-nine per cent interest-bearing indebtedness.

Each of the eight Wisconsin subsidiaries of Northern States Power Company (Del.) reported their income for the years here involved upon a separate accounting basis. The Tax Commission made an audit of the books and records of the Wisconsin subsidiaries and the other affiliates of the Northern States Power Company (Del.) group and concluded that the separate accounting method used by Wisconsin companies in reporting their income did not reflect their true income derived from business transacted and properly located in Wisconsin. As a result the Tax Commission made a separate additional assessment of income and income taxes against each of the eight Wisconsin subsidiaries of the Northern States Power Company (Del.) for the assessment years 1930 to 1933, inclusive. The method which the Tax Commission used to determine the true income derived from busi-

ness transacted and property located in Wisconsin by each of the Wisconsin subsidiaries of the Northern States Power Company (Del.) was as follows:

"1. The total net incomes of Northern States Power Company (Del.) and all of its subsidiaries, direct and indirect, including that of the appellants herein, were consolidated and adjusted to a figure which represented total income that would have been taxable had all of the property and business transacted by the said companies been within the state of Wisconsin.

"2. Of the total net income so determined, so much thereof was apportioned to property located and business transacted within Wisconsin as was the result of applying thereto the arithmetical average of the ratios of sales, property and manufacturing activities in Wisconsin to the total of sales, property and manufacturing activities everywhere.

"3. Of the total net income so apportioned to Wisconsin, so much thereof was attributed to each of the appellant taxpayers herein as was the result of applying thereto the arithmetical average of the ratios of sales, property and manufacturing activities of each of the appellant taxpayers in Wisconsin to the total of sales, property and manufacturing activities in Wisconsin."

The resulting taxes assessed against each of the appellant taxpayers and the amounts admitted to be due are as follows:

| | Total Taxes Assessed | Total Taxes Admitted to Be Due |
|---|---|---|
| Northern States Power Co. (Wis.) | $274,181.04 | $20,187.14 |
| Interstate Light & Power Co. (Wis.) | 20,013.52 | |
| Midland Public Service Co | 2,318.32 | |
| Chippewa Power Co | 31,523.09 | 4,961.89 |
| St. Croix Falls Wisconsin Improvement Co | 39,193.13 | 28,587.89 |
| | $367,230.00 | $53,736.92 |

The Tax Commission in its decision said:

"The issues involved are:

"1. May the taxable income of each of these taxpayers be determined by an apportionment of the consolidated net income of Northern States Power Company, a Delaware corporation, and its subsidiaries?

"2. If taxable income may thus be determined, may the apportionment be based on an average of the basis of sales, property and manufacturing activities in Wisconsin to the totals of such factors?

"3. Are the additional assessments barred by reason of not being made in time?"

In the course of its opinion the Tax Commission further stated:

"Inasmuch as the Wisconsin subsidiaries contributed forty per cent of the kilowatt-hours which were sold by the Minnesota subsidiaries in 1927, is it not true that such forty per cent of the kilowatt-hours contributed by the Wisconsin subsidiaries was the amount of kilowatt-hours that was used to produce forty per cent of the gross operating electric revenue of the affiliated Minnesota distributors in 1927?

"A vast amount of testimony has been produced by the taxpayers to justify the dealings between the Minnesota parent and the Wisconsin subsidiaries, but it would seem to the Tax Commission that it is necessary to consider as a whole the business transactions, the physical connections between the parent and its subsidiaries, and the methods of financing used, and the best evidence of the fairness of dealings between the Minnesota parent and Wisconsin subsidiaries should be what final profits came to the Wisconsin subsidiaries as compared to the out-of-state companies, as shown by Exhibit 122. . . .

"The auditor for the Tax Commission used the factors of, a. property, b. sales, c. manufacturing, in making the assessment. The taxpayers make no objections to the property and sales factors for apportionment percentages to arrive at the income earned in Wisconsin from business transacted and property located within the state, but they do object to the manufacturing factor as set up in the audit report. The

auditor used for the electric department the kilowatt-hours generated in the state to the total generated everywhere in the system; in the gas department, the thousand feet of gas generated in the state to the total everywhere, and in the other departments similar measures. The electric department largely predominates but to give proper recognition to each department, the electric department was weighted on the basis of electric sales to the total sales of all departments."

It is to be noted that this method of apportionment substitutes for cost, which is ordinarily used, the amount of product produced. Commenting upon this the commission said:

"If the cost of manufacturing is used as a factor instead of units manufactured, inasmuch as Wisconsin is predominantly hydro and Minnesota is predominantly steam, it gives an inequitable and unfair ratio. It appears that steam-generated kilowatt-hours are more expensive to produce than hydro-generated units, and if it costs more to produce steam energy there is less profit. If the cost of manufacturing were used, greater weight would be given to allocate apportionable income to the states where it costs the most to produce a kilowatt-hour, so that while a greater cost would in an economic sense produce less income, using cost of manufacturing instead of kilowatt-hours in the apportionment fraction would have the opposite effect of allocating income in a state where it cost the most to produce.

"The cost of generation per kilowatt-hour within Wisconsin, without Wisconsin, and within and without is shown definitely in Exhibit K-1, where, for the five-year period, the average cost within Wisconsin is .00229¢, without Wisconsin .00876¢, within and without Wisconsin .00578¢ per kilowatt-hour."

Upon the whole case the Tax Commission made the following findings:

"1. That it is not necessary for it to be bound in reaching its decision by the intercorporate contracts and arrangements between the appellants herein and the parent company.

"2. That from the facts of this case it is permissible not only under the statutes of the state of Wisconsin but also

under the decisions of the courts to consolidate and apportion the income of the appellants herein with the parent corporation and other interrelated corporations.

"3. That the intercorporate arrangements between the appellants herein and the parent corporation, Northern States Power Company of Delaware, and its other subsidiaries were not fair and reasonable.

"4. That the method employed by the auditors in the instant cases was the only method that could have been used to determine the just and equitable tax owing by the appellants herein to the state of Wisconsin on the income produced in Wisconsin from Wisconsin activities and property.

"5. That the evidence in the instant case shows plainly that the intercorporate arrangements did establish an unfair price for the power produced by the Wisconsin affiliates.

"6. That the intercorporate transactions in the instant case were unfair during the years under audit; that the purported considerations existing between the affiliates herein and between the subsidiaries and the parent company adopted from previous organizations, and those made after the organization of the corporations involved herein had the purpose and effect of evasion of the income tax law by diverting to the parent corporation or its designated affiliates a portion of the income properly attributable to its Wisconsin activities through subsidiaries doing business in the states not having an income tax law.

"7. That the corporations involved herein conducted their business so as to directly and indirectly benefit the members or stockholders of the parent corporation by selling the products of the Wisconsin subsidiaries at an unfair price and, on the other hand, selling to the Wisconsin subsidiaries at an excessive price.

"8. That the directors and officers of these interrelated corporations disposed of the products of the Wisconsin corporations in such a manner as to create improper net income attributable to Wisconsin.

"9. That the methods of bookkeeping adopted and carried out for the Wisconsin subsidiaries and the use of the officers and directors of the parent corporation and out-of-state affiliates as officers and directors of the Wisconsin corporations in effect made of the Wisconsin subsidiaries mere branches of the parent corporation.

"10. That the intercorporate agreements did constitute devices having the purpose and effect of covering up income actually produced in Wisconsin for the purpose of diverting income to the subsidiaries outside of Wisconsin and to the parent organization."

And directed that assessments be made accordingly.

Upon this appeal the principal contentions of the plaintiff taxpayers are: 1. Each appellant is a single taxable entity and is entitled to be treated as such and to have its taxable income determined by the methods specifically prescribed by secs. 71.02 and 71.03, Stats., and to have allowed the interest and other deductions provided for by those sections.

2. The Tax Commission is without authority, either under sec. 71.25, Stats., of the Income Tax Act or otherwise, to increase the amount of any appellant's taxable income by ascribing to it the income of other corporations by means of consolidating the income of separate corporations and allocating portions of the same to the appellants, first between the state of Wisconsin and other states and next among corporations doing business within Wisconsin, or by any other means. (a) Sec. 71.25 does not authorize consolidation of income. (b) No other provision of the Income Tax Act authorizes consolidation; and the taxing officers may not go beyond the limits of the statute and devise methods of their own for determining taxable income.   (c) Consolidation of the income of the group of some twenty corporations and its apportionment among states and among taxpayers would be inappropriate and invalid even if it were authorized by statute.

3. That the method pursued by the commission deprives appellants of due process of law guaranteed by the Fourteenth amendment.

4. That by sec. 71.25, Stats., the only authority given the commission is to find whether a corporation sells to or buys from affiliates at an unfair price with intent to divert income from the state, and if these facts are found, then to determine

what a fair price would have been and adjust the corporation's income accordingly.

5. Proof of intent to evade taxes and divert income from Wisconsin is indispensable to a disregard of intercorporate contracts, under sec. 71.25, Stats., or any other authority claimed by the commission.

Other contentions made by the taxpayers relate to matters of detail and so far as necessary will be stated in subsequent portions of this opinion.

The principal contentions of the Tax Commission are:

(1) Where income tax returns of a corporation made upon a separate accounting basis understate its true Wisconsin income, because such basis gives effect to intercompany contracts and arrangements which route its fair income to out-of-state affiliated companies, with a resulting evasion of income taxes, there is ample authority for the Tax Commission to make an independent determination of said corporation's true income, and in making such determination the Tax Commission may consolidate and apportion the income of the affiliated companies.

(2) The apportionment ratios applied to the consolidated income of all affiliated companies results in attributing to the taxpayers, the true Wisconsin income that would have been attributed to them except for the intercompany contracts and arrangements which unduly favored foreign affiliated companies.

(3) A resume of the record herein clearly shows that separate accounting of the various interrelated affiliates of the Northern States Power group cannot result in a proper reflection of income, but that the true income of each can only be determined by consolidation of the income of the entire Northern States Power group and apportionment thereof.

In considering the several contentions of the respective parties to these appeals we may properly preface our treatment by saying that we deal with nothing but the power of the com-

mission under the statute. What the power of the state may be in the premises is not before us for consideration and for that reason not considered.

A disposition of the case requires the construction and application of sec. 71.25, Stats. ·This matter was before the court in *Burroughs Adding Machine Co. v. Tax Comm., ante,* p. 423, 297 N. W. 574, decided herewith. The statute is there printed, considered, construed, and applied. We do not repeat here what is held in that case.

The respondents contend that the last clause of sec. 71.25 (1), Stats.:

". . . 'having due regard to the reasonable profits which but for such arrangement or understanding might or could have been obtained from dealing in such products,' . . . is merely a proviso or limitation upon the commission's authority, which makes it mandatory for the commission in those cases, where there exists an adequate basis for a separate accounting, to give specific weight to and use the reasonable profit which would have been obtained had the intercompany contracts been nonincome diverting, as the basis for computation of the taxpayer's taxable income. . . . But where there is no proper basis for a separate accounting the last clause in sec. 71.25 ·(1), Stats., obviously could not operate, and was not intended, to require the use of the separate accounting method because of the absence of any foundation for the use thereof."

The Tax Commission further contends that sec. 71.25 (2), Stats., was enacted for the express purpose of enabling the commission to determine the taxable income received by any one of the affiliates or related companies. In other words, that under the section as enacted, if the commission finds that there is "no proper basis for a separate accounting," sub. (2) authorizes the commission to employ a formula in the allocation of income. This matter is dealt with in the *Burroughs Adding Machine Co. Case, supra.* As applied to the facts of this case the contention of the Tax Commission is not sound. Each of the taxpayers in this case made a return

based upon a separate accounting. Sec. 71.25 provides a method for the correction of such a return in the cases therein described. The commission here seems to suppose itself to be dealing with a corporation whose income is taxable in two separate taxing jurisdictions. No one claims in this case that the total income of the taxpayers should not be subjected to taxation within the state of Wisconsin. In the cases specified therein sec. 71.25 provides a method for the ascertainment of that total income, and so far as we can see the statutes relating to allocation of income where it is taxable partly within and partly without the state, have no application whatever to taxpayer corporations domiciled in Wisconsin,—their income is taxable here wherever earned.

The finding of the Tax Commission that a contract made with a parent company or another affiliate is unfair does not confer jurisdiction upon the Tax Commission to devise other methods of computation and to discard those prescribed by statute. The language of sec. 71.02 (3) (d) 5—

". . . If the income of any such person properly assignable to the state of Wisconsin cannot be ascertained with reasonable certainty by either of the foregoing methods, then the same shall be apportioned and allocated under such rules and regulations as the tax commission may prescribe,"—

applies by its terms to cases where persons are engaged in business within and without the state. Without statutory authority the commission proceeds in this case to consolidate the incomes of the parent and affiliated companies and then to apply the formulas applicable to incomes taxable within and without the state. It not only does that but, having found by formulas the income of all the Wisconsin affiliates, it proceeds to apportion it among the affiliates by formulas. It, in effect, treats the whole matter as if there was but one taxpayer and that the parent corporation, its Wisconsin income being apportioned among the Wisconsin affiliates. We find no authority in the statutes for such procedure.

It is difficult to state with exact fairness what the commission did in this case. Without drawing any fine line between the facts stated in the course of the discussion and the facts stated formally in the findings of the commission, it seems to us quite apparent that what the commission did, stated broadly, was to arrive at a result by first applying a formula to the consolidated business of the parent company and its affiliates to determine what proportion of the total income was allocable to Wisconsin and then to apply a formula to the Wisconsin earnings to determine how those earnings should be distributed between the Wisconsin affiliates. Having arrived at a conclusion, the findings, besides being general and consisting of conclusions both of fact and of law rather than of the basic facts, were made to support the conclusions already arrived at. As one evidence of this, by the sixth finding it is found that the acts of the corporations involved "had the purpose and effect of evasion of the income tax law." While the commission used the term "purpose," what it found was that the intersubsidiary arrangements were made with the intent to evade the law. In its context the word "purpose" could have no other meaning. The primary definition of the word "purpose" is that which one sets before himself as an object to be attained and the word is commonly so used. The seventh finding is a paraphrase of the language used in sec. 71.25 (1), Stats. With respect to intent, upon the hearing the commission refused to admit evidence bearing upon the question of intent. This is not important except as it indicates that the commission changed its attitude during the course of the hearing. Upon the hearing it excluded evidence offered on intent but found against the taxpayers on that issue.

In its opinion the commission discusses at considerable length the evidence in the cases and makes certain statements with respect to the facts. The statements are in the main argumentative and put forward to sustain the conclusion already arrived at by the auditors, by application of the appor-

tionment method so that the true income of the taxpayer on an accounting basis is not disclosed. It is difficult to restate these factual considerations so as to connect them to any existing contract between the parent company and the subsidiaries or between the subsidiaries. There should be excepted from this broad statement that part of the decision relating to the Platteville division. As is held in the *Burroughs Adding Machine Co. Case, supra,* we consider this a wrong approach by the commission to the questions involved. Apparently the commission abandoned the statutory method for the reason that as stated in its findings:

"The method employed by the auditors in the instant cases was the only method that could have been used to determine the just and equitable tax owing by the appellants herein to the state of Wisconsin."

As was stated in the *Burroughs Adding Machine Co. Case, supra,* we find no insuperable difficulties in finding, if such be the fact, that a company is selling its products at a less than a fair price or in finding that it is purchasing products in a manner so as to create a loss or improper net income and after those facts have been determined, it should not be impossible to determine what the reasonable profits would have been but for such arrangements, having due regard to reasonable profit. Certainly the difficulty of solving such a problem falls far short of equaling the difficulty of ascertaining a just and fair rate in a rate case. The result of the application of formulas in these cases is, as in the *Burroughs Adding Machine Co. Case, supra,* to allocate earnings to Wisconsin, which are made outside of the state by subsidiary corporations who have purchased products from Wisconsin corporations. What is to be taxed in Wisconsin under the Income Tax Act is Wisconsin income. If a Wisconsin company manufactures a product which it sells outside of the state and the buyer thereafter resells it at a profit, Wisconsin can have no claim upon that profit. If the price paid for energy generated in Wisconsin

is a fair price, the fact that a subsidiary makes a profit upon a resale in Minnesota gives Wisconsin no right to tax the profit earned in Minnesota. That it appears to us is what the use of the formula method in effect does in this case.

The principal controversy in these cases revolves around two questions: (1) What constitutes firm and dump power and the relative price of firm and dump power? and (2) Intercompany financing charges? Inasmuch as a disposition of these cases will involve a reconsideration of these matters we submit the following observations:

It was apparently the opinion of the Tax Commission that because the power sold to the Minnesota companies was used by the Minnesota companies in Minnesota to supply peak power, it should be charged for at firm-power prices. It is conceded that peak power is the most expensive power for a steam plant to produce. It also appears without dispute that the power furnished by Wisconsin companies is what is ordinarily denominated dump power, and the taxpayers contend that its price should be fixed on that basis. What happens is this: A large part of the power disposed of in Minnesota is generated by steam plants. These are operated so as to supply a certain proportion of the firm-power demand. A dispatcher is employed, and in accordance with his orders additional demands are met by calling upon the plants generating electricity by water power. As the demand slackens the ponds fill up and when an increasing demand appears it can be more economically supplied by water-power generation than by steam-plant generation. This manipulation of hydraulic and steam-generated power enables the companies purchasing Wisconsin-generated hydraulic power to make a very efficient use of dump power which under ordinary circumstances cannot be accomplished. Apparently the tax authorities of Wisconsin look upon this process with a covetous eye and hold in effect that dump power should be valued at approximately firm-power prices because of the efficient utilization which the pur-

chasers make of it. The effect of the application of this theory is to allocate earnings of the Minnesota companies to Wisconsin.

The taxpayers on the other hand seem to assume that because Wisconsin dump power can find no market in Wisconsin, no consideration should be given to the influence of the market in the Twin Cities district. From this they conclude that the Wisconsin companies are to be credited with nothing but a dump-power price so far as intercompany transactions are concerned.

It is considered that both sides are in error. The statute assumes that there is such a thing as fairness in dealings between a parent and a subsidiary corporation. In fairness Wisconsin cannot draw within the state profits legitimately due to operations in another state. On the other hand, the taxpayer should not ignore the fact that power prices in Wisconsin are influenced by the proximity of the plants to a metropolitan market. The fact that such a market is adjacent to Wisconsin generating plants affects the demand and certainly increases the salability of the Wisconsin product. That fact should be reflected in the price, having due regard to the fact that the power generated in Wisconsin should yield a reasonable profit.

If the financing charges as between the parent company and the subsidiaries are out of line, there is no difficulty in reducing the interest rate to what is a fair going rate for purposes of allocating income. Quite obviously the parent company cannot make it difficult for its subsidiary to borrow in the open market and then charge an exorbitant rate of interest for the money which the subsidiary cannot borrow elsewhere.

Under the law each of the subsidiaries is entitled to be treated as a separate taxable entity and to have its income ascertained in accordance with the provisions of the Income Tax Act. The mere fact that it is more convenient to use a formula or that use of the formula produces a greater taxable

income in Wisconsin is no justification for a departure from the statutory method. We find no evidence in the record that there was ever any attempt made by the commission to ascertain a fair price either for products bought or sold although certain prices are denounced as unfair.

We do not attempt to deal with all the questions presented upon this appeal. We have said enough to indicate the course which we think should be pursued in the application of the statutory provisions. Upon a reconsideration of these cases many of the questions presented will be eliminated. If upon a hearing some questions raised here still persist they must be solved in the light of facts yet to be found.

We find no warrant in the statute for the procedure adopted by the commission in this case. Previous decisions and the decision in the *Burroughs Adding Machine Co. Case, supra,* mark out very clearly the proper approach to the problems involved. No doubt the legislature had substantial reasons resting in sound public policy for withholding from the commission the power of allocating incomes under the circumstances of these cases by application of formulas. The method of allocating income by formula has had a considerable vogue because of the simplicity of the method and the ease with which it may be applied. It is a method that is open to attack in every case, if it appears that it so operates as to reach income which is not fairly attributable to transactions within the jurisdiction of the state. *Hans Rees' Sons v. North Carolina* (1931), 283 U. S. 123, 51 Sup. Ct. 385, 75 L. Ed. 879.

We conclude in each case that the judgment of the circuit court should be reversed with directions to enter judgment setting aside the order of the commission confirming the tax with directions to the Tax Commission or its successor to assess the tax in accordance with the statute.

*By the Court.*—In each case the judgment is reversed, and cause remanded for further proceedings as indicated in the opinion.